**In re Bruce A. PELKEY, Respondent.**

**A Member of the Bar of the District of Columbia Court of Appeals.**

No. 06–BG–893.

District of Columbia Court of Appeals.

Argued Jan. 23, 2008.

Decided Dec. 23, 2008.

---

Hamilton P. Fox, III, Washington, for respondent.

Julia L. Porter, Senior Assistant Bar Counsel, with whom Wallace E. Shipp, Jr., Bar Counsel, and Judith Hetherton, Senior Assistant Bar Counsel, were on the brief, for the Office of Bar Counsel.

Before REID, Associate Judge, FARRELL, Associate Judge, Retired,* and PRYOR, Senior Judge.

REID, Associate Judge:

The Board on Professional Responsibility ("the Board") has recommended that respondent Bruce A. Pelkey be disbarred; that he be ordered to pay restitution to the Client's Security Fund with interest at a six percent rate; and that he be required to satisfy all outstanding judgments and orders against him in favor of complainant Linda Cavalli. The Board recommended disbarment based on its conclusion that Mr. Pelkey violated multiple provisions of the District of Columbia Rules of Professional Conduct. Mr. Pelkey challenges the Board's report and recommendation.

We conclude that Bar Counsel presented clear and convincing evidence that Mr. Pelkey violated the Rules of Professional Conduct, including Rules 8.4(b) (concerning criminal conduct "that reflects adversely on the lawyer's honesty, [or] trustworthiness . . . ."), 8.4(c) (relating to dishonest, fraudulent and deceitful conduct); 8.4(d) (pertaining to "conduct that seriously interferes with the administration of justice"); and 3.1, 3.2(a), 3.3(a)(1), and 4.4(a)

---

* Judge Farrell was an Associate Judge of the court at the time of argument. His status changed to Associate Judge, Retired, on July 1, 2008.

(relating to frivolous legal proceedings, proceedings that "would serve solely to harass" another, "false statement[s] of fact or law [made] to a tribunal," and use of "means that have no substantial purpose other than to ... delay, or burden a third person"). We also hold, in agreement with the Board, that, on this record, disbarment is the appropriate sanction for Mr. Pelkey's misconduct, and that his reinstatement should be conditioned upon his making full restitution to the Clients' Security Fund with interest, and his satisfaction of all judgments against him and in favor of Ms. Cavalli or related business entities.

## FACTUAL SUMMARY

The record before us, which includes factual findings made by the Hearing Committee and affirmed by the Board, shows that Mr. Pelkey, an attorney admitted to the District of Columbia Bar on April 3, 1995, practiced law in Arizona after being admitted in that jurisdiction in 1982.[1] Eventually, he moved to Virginia and accepted a post as a professor of law at Regent University. He also gave lectures in the Soviet Union, and he established an international consulting group. Ms. Cavalli specialized in international economic development[2] and worked as an investment banker in California before moving to Virginia. For a short period of time, she joined an entity in which a former United States Congressman, Mark Siljander, was involved and which was designed to encourage investment in the United States by foreign investors.

Mr. Siljander introduced Ms. Cavalli to Mr. Pelkey in June 1996. That was the beginning of a personal relationship and a mutual interest and collaboration in inter-national business ventures, particularly through a program operated by the United States Immigration and Naturalization Service ("INS"). Mr. Pelkey's role emerged as that of attorney and legal counsel for the ventures (his duties involved drafting incorporation documents and contracts), and Ms. Cavalli used her expertise and experience to generate proposals for immigrant investors, as well as to prepare business plans and marketing documents. She also developed investment opportunities for funds resulting from work with overseas investors. Consulting or investment entities established by Mr. Pelkey and by Ms. Cavalli played a role in the Pelkey/Cavalli business ventures. These included Consulting Group International ("CGI") and Trading Partners International ("TPI"), both owned by Mr. Pelkey; and Signet Services Group ("Signet") and Tourism Support Services ("TSS"), both belonging to Ms. Cavalli. Two other entities, one of which became a subject of dispute between Ms. Cavalli and Mr. Pelkey, were Trading Partners International of California ("TPIC") and American Opportunity International Services ("AOIS").

Between 1996 and 1998, Mr. Pelkey and Ms. Cavalli not only planned certain business ventures, but also established them and realized income from those ventures, particularly through a proposal (prepared by Ms. Cavalli) for an export trading Regional Center under INS's Immigrant Investor Pilot Program (also known as the U.S. Investor Visa Program). Business plans were developed, primarily by Ms. Cavalli, for an African project under the Investor Pilot Program, with M. Tshiamala Kadala Mianda of the Democratic Republic

---

1. In addition to his law degree from Pepperdine University School of Law, Mr. Pelkey holds a masters degree in business administration from Arizona State University.

2. Ms. Cavalli graduated with highest honors from the University of California at Davis.

of the Congo; and for an investment project with the Russian Fund Vostock for which both Mr. Pelkey and Ms. Cavalli served as the contacts. Ms. Cavalli advanced approximately $32,000 of her own personal funds to help cover the costs of the ventures. The Hearing Committee and the Board determined that Mr. Pelkey had provided legal services to the Pelkey/Cavalli business entities. As the Board stated: "Although the Committee does not specify the business entities, the record supports a finding that [Mr. Pelkey] provided legal advice, at a minimum, for Trading Partners International of California (made up of entities owned by Respondent and Cavalli) and [AOIS] (jointly created by Respondent and Cavalli)."

In April 1997, Ms. Cavalli submitted a proposal to INS for the establishment of TPIC as a Regional Center under the Immigrant Investor Pilot Program; the proposal stated that "TPIC is wholly owned by its two members, [TPI], a subsidiary of [CGI], and [Signet]." INS sent Ms. Cavalli a letter in August 1997, approving the proposal and designating TPIC as a Regional Center under the Immigrant Investor Pilot Program. A related contract with Mr. Tshiamala and his California export trading company, Somico LLC, was executed in February 1998, resulting in $177,500 in fees for the Cavalli/Pelkey African investor business venture. In addition, Mr. Pelkey and Ms. Cavalli traveled to Russia in 1997 to solicit business from Fund Vostock, and a contract with that Fund was executed in October 1997. Fund Vostock made a $50,000 investment with TPIC in November 1997, and another $50,000 investment in 1998.

The factual bases for many of Bar Counsel's charges against Mr. Pelkey took place after the relationship between Ms. Cavalli and Mr. Pelkey crumbled.[3] Ms. Cavalli returned to California in August 1998, and she learned, around 1999, that neither her name nor Signet's name appeared in the TPIC legal documents that Mr. Pelkey drafted and filed, that he in fact had listed only his name and those of his entities, CGI and TPI, as the owners and managers of TPIC. By around April 2000, the Cavalli/Pelkey business relationship had deteriorated substantially and Ms. Cavalli and Mr. Pelkey were locked in bitter litigation in the District of Columbia Superior Court, filed by Ms. Cavalli in May 2000, and in California Superior Court, lodged by Mr. Pelkey in August 2000. A heated, fractious, and bitter dispute erupted concerning an Arbitration Agreement signed by both which was designed to resolve the litigation in the District of Columbia and the California courts.

Mr. Pelkey and Ms. Cavalli disagreed over whether Ms. Cavalli was a business partner (Ms. Cavalli's position) or a consultant (Mr. Pelkey's position). Ms. Cavalli insisted that Mr. Pelkey had agreed to take responsibility for forming TPIC as an entity wholly owned by TPI (Mr. Pelkey's entity) and Signet (Ms. Cavalli's entity), with Mr. Pelkey as a "Managing Partner" and Ms. Cavalli also as a "Managing Partner." The Hearing Committee credited the testimony of Ms. Cavalli, and found that documents created in 1996 and 1997, including a February 26, 1997 document prepared by Ms. Cavalli and personally edited by Mr. Pelkey in his own handwriting, confirmed not only that Ms. Cavalli was intended to be a business partner for the ventures, but also that Mr. Pelkey was not "the prime mover in the establishment and success of th[e] immigration investor

---

**3.** Mr. Pelkey and Ms. Cavalli were first introduced socially in 1996 and they had both a romantic and a business relationship for approximately two and one-half years.

program," as he claimed.[4]  In addition, the Board asserted: "Respondent argues that [Ms.] Cavalli was never an equity partner in any of his companies, but the record is replete with evidence to support the [Hearing] Committee's findings to the contrary."

In addition to disagreeing about whether Ms. Cavalli was a business partner or a consultant, Mr. Pelkey and Ms. Cavalli quarreled about the funds generated from their business ventures.  These funds were deposited in Mr. Pelkey's bank accounts as they were received, and he was the sole signatory on the accounts.  In April and June 1998, respectively, Ms. Cavalli and Mr. Pelkey placed $30,000 from the Fund Vostock project and $50,000 from the African project into Ms. Cavalli's investment account in Costa Rica, TSS.  Mr. Pelkey claimed that these funds belonged to him, and his efforts to retrieve the funds invested in TSS, as well as resulting dividends, sparked the litigation filed by Ms. Cavalli and by him.  In late 1999, Mr. Pelkey began to demand the return of funds from the TSS investment which he then calculated to be $125,000

(the original $80,000 investment plus dividends).  After receiving letters from Mr. Pelkey's attorney, Ms. Cavalli authorized the release of two payments to Mr. Pelkey, $15,000 in late October and $19,000 in late November.  The Hearing Committee determined that, in December 1999, a law firm representing Mr. Pelkey accused Ms. Cavalli of "fraudulent actions" and demanded $110,000 within fifteen days; an earlier October 1999 letter stated that Ms. Cavalli would be in "violation of the California Penal Code" if she failed to remit the demanded sums of money.

Mr. Pelkey's actions regarding an arbitration agreement, designed to mediate the complaints filed in the District of Columbia and California courts, not only served as the factual basis of some of Bar Counsel's charges and the Hearing Committee's findings, but also formed the basis for the Court of Appeal of the State of California's decision to impose a monetary sanction against him.  After Mr. Pelkey and Ms. Cavalli executed their Arbitration Agreement on July 19, 2001, Mr. Pelkey balked at arbitrating.  The Hearing Committee

---

**4.** In finding Ms. Cavalli's testimony credible, the Hearing Committee stated:

> Having observed Ms. Cavalli for two days on the witness stand, we find her testimony most candid and truthful.  She did not try to avoid answering questions, her answers were responsive to the questions—not evasive, the documentary evidence reinforced her story, and there was no impeachment of her testimony.

In contrast, the Hearing Committee discredited Mr. Pelkey's testimony, saying in part: [Mr. Pelkey's] testimony was found to be largely lacking in credibility—particularly on the crucial factual issues: (1) were he and Cavalli partners, (2) was it understood that Cavalli would have an ownership interest in their venture, particularly TPIC, and (3) did they have a personal/romantic relationship in the 1996–1998 timeframe.  Respondent's demeanor during six days of hearings was exemplary, as was everyone else involved in the hearing.  However, on many occasions during his testimony, Respondent simply strayed from what we perceive to be the truth.  This was a heavily-documented record (five large volumes of exhibits), including many memoranda, e-mails, drafts, marketing brochures, reports/studies for clients, correspondence, and court papers (including verified declarations) prepared and filed in the 2000–2005 litigation between these two persons.  Both during Respondent's direct testimony (over a say), as well as a day and a half of cross examination by the Hearing Committee, it was clear that he was dissembling badly over certain key documents—documents often from his own business files, and in other ways.

The Hearing Committee then provided several pages of concrete examples to support its credibility determination concerning Mr. Pelkey.

determined that he "signed [the agreement to arbitrate] . . . in part, to avoid going to trial in the civil action pending in the [District], but with the hidden intent to later challenge the arbitration agreement if things didn't work out." He began to draft a declaration in support of a motion to rescind the agreement on July 20, 2001, and he personally filed the motion and declaration on March 23, 2002 in California, after Ms. Cavalli had filed a formal demand for arbitration in February 2002, following unsuccessful efforts to arbitrate in accordance with the arbitration agreement. Mr. Pelkey blamed Ms. Cavalli for forcing him to sign the arbitration agreement, and complained about the arbitration fees.

The California Superior Court denied Mr. Pelkey's motion to rescind the arbitration agreement on June 21, 2002, and on June 27, 2003, after hearing testimony from Mr. Pelkey and Ms. Cavalli, the arbitrator issued a decision finding that "[Mr.] Pelkey had committed fraud in his deal-ings with Ms. Cavalli."[5] The arbitrator awarded her approximately $300,000 ($238,822 in compensatory damages and $58,843 in attorney's fees and costs).[6] The California Superior Court affirmed the arbitrator's award on August 18, 2004, and ordered Mr. Pelkey to pay Ms. Cavalli $22,000 in additional attorney's fees. Undeterred, Mr. Pelkey lodged three separate appeals relating to the litigation, prompting the Court of Appeal of the State of California, on May 31, 2005, to verbally chastise him for "blatant misrepresentation" of one of the court's rulings, "distort[ion] of the court's comments at a hearing," and for a meritless appeal. The court imposed a sanction in the amount of $6,000, to be paid to Ms. Cavalli.[7] The Hearing Committee's examination of "verified statements" by Mr. Pelkey, made in a March 14, 2001 document, raised other questions about Mr. Pelkey's honesty; the Hearing Committee cited several statements that it "found to be false based on

5. The arbitrator found
   by clear and convincing evidence that [Mr.] Pelkey intentionally misled [Ms.] Cavalli as to his true plan for their joint business relationship. [Ms.] Cavalli thought she was an equal partner with [Mr.] Pelkey based on statements of [Mr.] Pelkey, documents and conduct of the parties; and [Mr.] Pelkey at all times fraudulently concealed the fact that he never intended to treat [Ms.] Cavalli as a partner.

6. The arbitrator determined that Mr. Pelkey had been "untruthful during live sworn testimony at the Arbitration Hearing," and that "[i]n addition to contradicting himself under oath, and making false prior statements under oath, a number of documents were introduced into evidence which contradict salient portions of his testimony."

7. Ms. Cavalli had requested around $19,000 in attorney's fees and costs. In explaining the reasons for the sanction, the court stated in part:
   There is no valid reason for this appeal. The bulk of Pelkey's arguments are nothing more than an attempt to relitigate his previous failed appeal of the final June 21, 2002 fee award, which is now long since final. His insistence that this order remains subject to collateral attack under a highly dubious theory of voidness points strongly to a motive to harass and delay. . . .
   He . . . stretches the record beyond recognition in the characterization of his February 18, 2003 letter. He similarly distorts the court's comments at the hearing on his Code of Civil Procedure . . . motion. . . . Finally, Pelkey's attempt to disguise the court's continuance of his . . . motion as a denial, and then to challenge that non-ruling on appeal, is patently frivolous.
   If a reputation for honesty is the coin of the judicial realm, here Pelkey has squandered his riches on such positions most unwisely. He has dragged Cavalli and this court into a factual and legal thicket, requiring an unduly large investment of the plaintiff's time and resources and the court's as well. . . .

the record" it had compiled; these included:

I have never been in business with Ms. Cavalli, in any manner whatsoever.

Ms. Cavalli made absolutely no investments into any of the businesses. . . . There were never any financial contributions made by Ms. Cavalli into any of the businesses. . . .

[N]o joint business activities were ever conducted by Ms. Cavalli and I. . . . [T]here was no '2½ year business relationship' between Ms. Cavalli and I.

[T]here were never any joint assets of any kind or nature whatsoever, between Ms. Cavalli and I or between Ms. Cavalli and my businesses.

Ms. Cavalli has created a false impression . . . that our 'personal relationship' was something more than a friendship. . . . Ms. Cavalli and I have never had any romantic relationship. . . .

While the Hearing Committee recommended that the charges under Rules 1.15(a) and (b) "be dismissed as not proven by clear and convincing evidence on the existence of an attorney-client relationship," the Board concluded that "based on the [Hearing] Committee's findings, . . . [Mr. Pelkey's] conduct did amount to a misappropriation of the funds of two of his corporate clients"; that "he held himself out as a lawyer and exploited his position both in his dealings with [Ms.] Cavalli as well as his work on behalf of their jointly owned companies, TPIC and AOIS"; and that "[t]he fiduciary duty that [he] owed to these companies bears a direct relationship to the financial services he provided." Hence, "[b]y treating the financial assets of [TPIC and AOIS] as his own, . . . [Mr.

Pelkey] engaged in intentional misappropriation" under Rule 1.15(a). Furthermore, the Board declared that because Mr. Pelkey "failed promptly to render a full accounting of a client's entrusted funds [that is, those belonging to TPIC and AOIS] when requested to do so," and further, because he "utilized [his attorney accounts—three belonging to CGI and two to TPIC] interchangeably for his own personal use, . . . Bar Counsel established by clear and convincing evidence" that he violated Rule 1.15(b).[8]

The Board sustained the Hearing Committee's findings and conclusions relating to Mr. Pelkey's violations of Rules 3.1 (filing frivolous appeals in the California litigation), 3.3(a) (making false statements in the sworn March 14, 2001 declaration filed in the Superior Court of California), 3.2(a) and 4.4 (causing delay solely to harass and burden Ms. Cavalli through his efforts to rescind the arbitration agreement and other behavior). The Board also addressed the alleged violations of Rule 8.4. Contrary to the conclusion of the Hearing Committee that Bar Counsel failed to prove "the 'intent' element" of the Rule 8.4(b) violation, the Board "f[ou]nd that [Mr. Pelkey's] transfer of funds from an account belonging to a company jointly owned by himself and [Ms.] Cavalli to an account within his exclusive control constituted theft . . . [,]" and hence, he "committed a crime that reflects adversely on a lawyer's honesty, trustworthiness or fitness as a lawyer. . . ." The Hearing Committee and the Board both agreed that Mr. Pelkey violated Rule 8.4(c) by being dishonest in his business dealings with Ms. Cavalli. Both also concluded that Mr. Pel-

---

**8.** The Hearing Committee recommended that the charges under Rules 1.7(b)(4), 1.8(a) and (g)(2), and 1.15(a) and (b) "be dismissed as not proven by clear and convincing evidence on the existence of an attorney-client relationship." Because of its conclusions under Rules 1.15(a) and (b) and its recommendation of disbarment, the Board did not address the alleged violations of Rules 1.7(b)(4), and 1.8(a) and (g)(2).

key violated Rule 8.4(d), seriously interfering with the administration of justice, when he filed frivolous motions and appeals in the California courts.[9]

Based upon Mr. Pelkey's rule violations, especially Rule 8.4(c), the Hearing Committee recommended a three-year suspension with reinstatement conditioned on a fitness requirement. However, partly in light of its conclusion that Mr. Pelkey violated Rules 1.15(a) and (b) by engaging in intentional misappropriation, the Board recommended disbarment as a sanction, but the Board indicated that even without a finding of intentional misappropriation, disbarment was the appropriate sanction.

## ANALYSIS

### Standard of Review

■■■ "When examining a Report and Recommendation from the Board on Professional Responsibility, . . . [w]e must accept the findings of fact made by the Board unless they are unsupported by substantial evidence of the record, and shall adopt the recommended disposition of the Board unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or otherwise would be unwarranted."[10] Similarly, "the Board is obligated to accept the hearing committee's factual findings if those findings are supported by substantial evidence in the record, viewed as a whole."[11] This court owes no "deference to the Board's determination of ultimate facts, which are really conclusions of law,"[12] "and we have the obligation to make our own determination on the issue."[13]

### The Rule 8.4(b), (c) and (d), and Rule 3.3(a), 3.1, 3.2(a), and 4.4(a) Violations

Mr. Pelkey challenges the Board's findings and conclusions that he violated Rules 8.4(b), (c) and (d).[14] With respect to Rule 8.4(b), he contends that the Bar Counsel did not present clear and convincing evidence of theft, specifically, that he "had the requisite specific intent" or that he made a "transfer of funds not belonging to him." He also emphasizes the Hearing Committee's conclusion with respect to the Rule 8.4(b) violation, that the evidence was

9. As for the alleged violation of Rule 8.4(g) concerning the threat of "criminal charges . . . solely to obtain an advantage in a civil matter," the Hearing Committee believed that Bar Counsel sustained its burden of proof, but the Board found the references in Mr. Pelkey's October 23, 1999 letter to "a violation of the California Penal Code," and in his December 1999 letter, to "invok[ing] all governmental investigative resources available to us . . . [,]" to be "sufficiently vague" to dissuade the Board from recommending a violation of Rule 8.4(g).

10. *In re Elgin*, 918 A.2d 362, 373 (D.C.2007) (quoting D.C. Bar R. XI, § 9(g) (2006)) (internal quotation marks omitted).

11. *In re Bailey*, 883 A.2d 106, 115 (D.C.2005) (citation and internal quotation marks omitted).

12. *In re J.E.S.*, 670 A.2d 1343, 1344 (D.C. 1996) (citation and internal quotation marks omitted). Conclusions of law are reviewed *de novo*, *In re Lloyd F. Ukwu*, 926 A.2d 1106, 1116 (D.C.2007).

13. *In re Fair*, 780 A.2d 1106, 1110–11 (D.C. 2001).

14. Rule 8.4 of the District of Columbia Rules of Professional Responsibility provides in pertinent part:

It is professional misconduct for a lawyer to:

. . . .

(b) Commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects;

(c) Engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

(d) Engage in conduct that seriously interferes with the administration of justice. . . .

insufficient to "find that Respondent intentionally defrauded [Ms.] Cavalli, or otherwise committed a criminal act." As for Rule 8.4(c) relating to dishonesty, Mr. Pelkey claims that the evidence presented by Bar Counsel failed to establish "the necessary dishonest intent," and that the Hearing Committee made a clear factual error by not finding that he filed the organization papers for TPIC showing that he wholly owned that entity on April 9, 1997, approximately three weeks before Ms. Cavalli submitted the INS application on April 28, 1997. Furthermore, he asserts, the Board "improperly applied" the District's Rule 8.4(d) and Rule 3.3(a)[15] instead of the California rules because the charged actions took place in the California judicial proceeding.[16]

Bar Counsel argues that "[t]he Board correctly found that [Mr. Pelkey's] 'outright taking' of the funds owed to [Ms.] Cavalli ... constituted theft in violation of Rule 8.4(b)....'" In determining whether Mr. Pelkey engaged in theft, Bar Counsel asserts, "the Board adopted the [Hearing] Committee's finding that [Mr. Pelkey] intentionally led [Ms.] Cavalli to believe that she was an equal partner in their business venture and would share equally in its profits," and the Board "also adopted the [Hearing] Committee's finding that [Mr.

Pelkey] dishonestly and surreptitiously prepared and filed documents omitting [Ms.] Cavalli from an ownership interest, and then engaged in an 'outright taking' or 'appropriation of money rightfully belonging to his business partner.'" Furthermore, Bar Counsel maintains that in "deliberately deceiv[ing] and defraud[ing][Ms.] Cavalli by leading her to believe that they were partners in their joint business venture," Mr. Pelkey violated Rule 8.4(c) in addition to Rule 8.4(b). Bar Counsel points out that for "[o]ver a two and a half year period," Mr. Pelkey "intentionally led [Ms.] Cavalli to believe they were equal partners in the business venture and thereby induced her to contribute more than $32,000 of her own funds and her full-time services"; but then "'intentionally and surreptitiously' excluded her from an ownership interest" and took the funds from the ventures. As for Rule 8.4(d) and Rule 3.3(a), Bar Counsel contends that these District rules apply because Mr. Pelkey "made false [ ]representations and harassed [Ms.] Cavalli in the action before the D.C. Superior Court," and Mr. Pelkey was "neither licensed to practice in California nor admitted to practice before the courts there."

■ First, our *de novo* review of the record constrains us to conclude, in agree-

---

**15.** Rule 3.3(a) provides in pertinent part:
(a) A lawyer shall not knowingly:
(1) Make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer....

**16.** He claims that Rule 8.5(b)(1) mandates application of the applicable California rules, not the District's rules. Rule 8.5(b) provides:
(b) *Choice of Law.* In any exercise of the disciplinary authority of this jurisdiction, the Rules of Professional Conduct to be applied shall be as follows:
(1) For conduct in connection with a matter pending before a tribunal, the rules to be applied shall be the rules of the jurisdic-

tion in which the tribunal sits, unless the rules of the tribunal provide otherwise, and (2) for any other conduct, (i) if the lawyer is licensed to practice only in this jurisdiction, the rules to be applied shall be the rules of this jurisdiction, and (ii) if the lawyer is licensed to practice in this and another jurisdiction, the rules to be applied shall be the rules of the admitting jurisdiction in which the lawyer principally practices; provided, however, that if particular conduct clearly has its predominant effect in another jurisdiction in which the lawyer is licensed to practice, the rules of that jurisdiction shall be applied to that conduct.

ment with Bar Counsel and the Board, that Mr. Pelkey violated Rule 8.4(b). We have recognized that "a criminal conviction is [not] a prerequisite for finding a violation of Rule 8.4(b)."[17] We hold in this disciplinary proceeding that Bar Counsel proved by clear and convincing evidence that Mr. Pelkey committed theft by "wrongfully obtain[ing] or us[ing] the property of another [Ms. Cavalli] with intent: (1) To deprive the other of a right to the property or a benefit of the property; or (2) To appropriate the property to his ... own use...."[18] With respect to the intent element, "theft under District law 'does not require an intent to appropriate property permanently.'"[19]

The record evidence compiled by Bar Counsel in this case established that Ms. Cavalli was Mr. Pelkey's business partner in ventures pertaining both to the contract with Mr. Tshiamala and Somico LLC under the U.S. Investor Visa Program, and the contract with Fund Vostock, and that she contributed $32,000 of her own funds as well as her full-time labor to support these ventures. A February 1997 document edited by Mr. Pelkey in his own handwriting confirmed that Ms. Cavalli was intended to be a business partner for the ventures and, as such, she was entitled to have her entity, Signet, included in the ownership of TPIC and to share the returns generated in behalf of TPIC. Yet, Mr. Pelkey not only left Signet out of TPIC's ownership papers, but also put the monetary returns from these ventures in his own bank accounts which he solely controlled, thus taking or appropriating the monies, some of which belonged to Ms. Cavalli, and using them as he saw fit. Mr. Pelkey's argument that the Hearing Committee made a clear factual error by not finding that he filed the organization papers for TPIC before Ms. Cavalli submitted the INS application, ignores the evidence credited by the Hearing Committee (and earlier by the arbitrator) that Ms. Cavalli was intended to be a business and equity partner, not a consultant, and hence, Signet should have been named in the organization documents as well as Ms. Cavalli as a Managing Partner. The fact that Mr. Pelkey may have filed the business organization documents before the INS application was submitted is of no moment.

Moreover, through his legal counsel who accused Ms. Cavalli of "fraudulent actions," Mr. Pelkey boldly insisted that Ms. Cavalli pay him $125,000 from the TSS Costa Rican investment account (the $80,000 placed in the account from the Pelkey/Cavalli business ventures plus what Mr. Pelkey deemed to be dividends owed on that sum); Ms. Cavalli felt compelled to send him $34,000 of the TSS funds. Mr. Pelkey persisted and through litigation he deliberately sought to deprive Ms. Cavalli of any assets resulting from the Pelkey/Cavalli ventures. Mr. Pelkey's actions demonstrated not only an intent to deprive Ms. Cavalli of funds properly belonging to her, but also to take and claim the other returns on the Pelkey/Cavalli business ventures as his own, to be placed in his

---

17. *In re Slaughter*, 929 A.2d 433, 445 (D.C. 2007) (quoting *In re Slattery*, 767 A.2d 203, 207 (D.C.2001) ("an attorney may be disciplined for having engaged in conduct that constitutes a criminal act that reflects adversely on his or her fitness as a lawyer under Rule 8.4(b) or engaging in dishonest or deceitful conduct, despite not having been prosecuted for such actions")).

18. *In re Slattery, supra* note 17, 767 A.2d at 212 (citing D.C.Code § 22–3811(b) [Repl. 1996; recodified at D.C.Code § 22–3211 (2001)]).

19. *In re Gil*, 656 A.2d 303, 305 (D.C.1995) (quoting *Fredericks v. United States*, 306 A.2d 268, 270 (D.C.1973)).

bank accounts under his sole control, and to be used as he saw fit.

■■■■ Second, our *de novo* review of the record further leaves us with no doubt that Bar Counsel introduced more than sufficient evidence to establish Mr. Pelkey's blatant and unconscionable violation of Rule 8.4(c) over the course of several years. At the outset of our analysis of this charged violation, we note that " '[a]cts unrelated to the practice of law may nonetheless violate [Rule 8.4(c)].' " [20] In terms of proof, "[a] violation of Rule 8.4(c) requires a showing that a respondent was dishonest, deceitful, fraudulent or misrepresented the truth." [21] "Dishonesty is a lack of honesty, probity, integrity and straightforwardness"; [22] and "[d]eceit is the active suppression of facts by one bound to disclose them, or the giving of 'information of other facts which are likely to mislead for want of communication of that fact.' " [23]

Mr. Pelkey not only was dishonest but also deceitful within the meaning of Rule 8.4(c). In his June 2003 ruling, the arbitrator characterized Mr. Pelkey as "untruthful during live sworn testimony at the Arbitration Hearing," determining that Mr. Pelkey made "false prior statements under oath," and that "documents were introduced which contradicted salient portions of his testimony." Nevertheless, Mr. Pelkey's blatant dishonesty persisted in his 2005 testimony before the Hearing Committee. In its December 16, 2005 report, the Hearing Committee determined that Mr. Pelkey's "testimony was ... largely lacking in credibility—particularly on the crucial factual issues: (1) were he

and [Ms.] Cavalli partners, (2) was it understood that [Ms.] Cavalli would have an ownership interest in their ventures, particularly TPIC, and (3) did they have a personal/romantic relationship in the 1996–1998 timeframe." Moreover, as we have emphasized previously, the February 1997 document edited by Mr. Pelkey in his own handwriting confirmed that the two intended Ms. Cavalli to be a business partner for the Pelkey/Cavalli business ventures, but Mr. Pelkey steadfastly and dishonestly attempted to deny this fact as well as the fact that Ms. Cavalli was an equity partner in the ventures. Furthermore, the Hearing Committee ascertained that several "verified statements" by Mr. Pelkey in a March 2001, document were dishonest including: "I have never been in business with Ms. Cavalli, in any manner whatsoever"; "There were never any financial contributions made by Ms. Cavalli into any of the businesses"; "There was no '2½ year business relationship' between Ms. Cavalli and I" and "Ms. Cavalli and I have never had any romantic relationship." Even the Court of Appeal of the State of California found it necessary to chastise Mr. Pelkey on May 31, 2005, for "blatant misrepresentation" of one of its rulings, and for "distort[ion] of the court's comments at a hearing."

All of the statements mentioned above which were made by Mr. Pelkey, the credibility determinations made by the arbitrator and the Hearing Committee, and the chastising comments of the California Court of Appeal reflect, Mr. Pelkey's glaring lack of honesty, integrity and probity. Moreover, Mr. Pelkey's actions in attempt-

---

20.  *In re Gil, supra* note 19, 656 A.2d at 306 (quoting *In re Kennedy*, 542 A.2d 1225, 1228 (D.C.1988)).

21.  *In re Slattery, supra* note 17, 767 A.2d at 213.

22.  *Id.* (citing *In re Shorter*, 570 A.2d 760, 767–68 (D.C.1990)).

23.  *Id.* (citing *In re Shorter, supra* note 22, 570 A.2d at 767 n. 12).

ing to suppress the truth regarding his business and personal relationships with Ms. Cavalli, despite his obligation to be truthful, can only be described as deceitful and as a deliberate effort to mislead the arbitrator and the Hearing Committee. Thus, we conclude that Bar Counsel proved by clear and convincing evidence that Mr. Pelkey clearly violated Rule 8.4(c).

■ Third, based on our *de novo* review, we conclude that Bar Counsel presented clear and convincing evidence that Mr. Pelkey violated Rules 8.4(d), 3.1, 3.2(a), 3.3(a)(1), and 4.4(a). In filing frivolous appeals in the California court, and in moving in the court both to rescind the arbitration agreement after signing it and to remove the arbitrator after participating in the selection of him, Mr. Pelkey violated Rule 8.4(d) by "engag[ing] in conduct that seriously interferes with the administration of justice," and 3.3(a)(1) [24] by filing a false verified declaration in a tribunal. He also ran afoul of Rules 3.1 [25] and 3.2(a) [26] by harassing Ms. Cavalli with respect to the arbitration agreement, and Rule 4.4(a) [27] by burdening her with an unnecessarily protracted arbitration proceeding and litigation in the California courts,[28] as he engaged in tactics to avoid and prevent the arbitration, even though he had signed an agreement consenting to arbitration.

### Sanction

■ As his first position on sanction, Mr. Pelkey claims that his behavior merits no sanction. As he put it: "[I]t is Mr. Pelkey's position that he has committed no violation of the Rules of Professional Conduct, and therefore . . . no sanction is appropriate." As a secondary position, he asserts that "the sanction should not be the Board's recommendation of disbarment. He claims that the Board erred in finding that he committed criminal theft and fraud and other acts of dishonesty," but if the court "disagrees," "he should not be disbarred" under either *In re Slattery* or *In re Gil;* and that if the court determines that the only violations are those relating to the California litigation, "a brief suspension is the appropriate sanction." In contrast, both Bar Counsel and the Board recommend disbarment as the appropriate sanction; and the Hearing Committee, based primarily on the Rule 8.4(c) violation, recommend a three-year suspen-

24. Rule 3.3(a)(1) states: "A lawyer shall not knowingly: (1) Make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer, unless correction would require disclosure of information that is prohibited by Rule 1.6 [concerning confidentiality of information]."

25. Rule 3.1 specifies in pertinent part:

A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous, which includes a good-faith argument for an extension, modification, or reversal of existing law. . . .

26. Rule 3.2(a) states: "In representing a client, a lawyer shall not delay a proceeding when the lawyer knows or when it is obvious that such action would serve solely to harass or maliciously injure another."

27. Rule 4.4(a) reads:

In representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person, or knowingly use methods of obtaining evidence that violate the legal rights of such a person.

28. Since we conclude that Mr. Pelkey's violation of Rules 8.4(b), (c), and (d) alone, and together with his violation of Rules 3.3(a), 3.1, 3.2(a), and 4.4(a), merits the ultimate sanction of disbarment, we do not consider the other charged violations, including Rules 1.15(a) and (b).

sion with a fitness requirement for reinstatement. Notably, the Board asserts, "even if the [c]ourt were to find that [Mr. Pelkey] had not engaged in intentional misappropriation of entrusted funds, our recommended sanction would be disbarment."

■■ "A recommendation of the Board with respect to a proposed sanction comes to this court with a strong presumption in favor of its imposition."[29] However, we take into consideration several factors, including, but not limited to:

(1) the seriousness of the conduct at issue; (2) the prejudice, if any, to the client which resulted from the conduct; (3) whether the conduct involved dishonesty and/or misrepresentation; (4) the presence or absence of violations of other provisions of the disciplinary rules[;] (5) whether the attorney had a previous disciplinary history; (6) whether or not the attorney acknowledged his or her wrongful conduct; and (7) circumstances in mitigation of the misconduct.[30]

"Generally speaking, if the Board's recommended sanction falls within a wide range of acceptable outcomes, it will be adopted and imposed."[31] But, "[i]n the final analysis, it is the court which decides the sanction to be imposed."[32]

We have imposed the sanction of disbarment in two types of dishonesty cases—(1) intentional or reckless misappropriation where the presumptive sanction is disbarment,[33] and (2) dishonesty "of the flagrant kind."[34] Related to the second category are two cases, (a) one in which we described the respondent's misconduct as "grave enough to require disbarment" due to violations of Rules 8.4(b) and (c), and where the Board had recommended disbarment for "criminal conduct and 'extremely serious acts of dishonesty' ";[35] and (b) the other in which the attorney was "in a position of trust," (although not an attorney-client relationship) and took "fiduciary funds" for his own "personal use,"[36] and we imposed disbarment due to violations of Rules 8.4(b) and (c).[37]

Our consideration of the factors which we apply to determine the appropriate sanction leads us to accept the Board's recommendation that the appropriate sanction in this case is disbarment. We

**29.** *In re Slaughter, supra* note 17, 929 A.2d at 446 (citing *In re Goffe*, 641 A.2d 458, 463 (D.C.1994) (per curiam)).

**30.** *In re Thyden*, 877 A.2d 129, 144 (D.C.2005) (citations omitted).

**31.** *In re Slaughter, supra* note 17, 929 A.2d at 446 (citing *In re Goffe, supra* note 29, 641 A.2d at 463–64).

**32.** *In re Elgin, supra* note 10, 918 A.2d at 376 (citing *In re Temple*, 629 A.2d 1203, 1207 (D.C.1993)).

**33.** *See In re Cloud*, 939 A.2d 653, 660 (D.C. 2007), as amended 2008 D.C.App. LEXIS 284 (D.C. March 13, 2008) ("When the evidence shows intentional or reckless misappropriation, disbarment is the appropriate sanction in nearly all cases, unless there are extraordinary circumstances that justify a lesser sanction.") (quoting *In re Dixon*, 763 A.2d 730, 732 (D.C.2000) (internal quotation marks omitted) and citing *In re Addams*, 579 A.2d 190, 191 (D.C.1990) (en banc)).

**34.** *In re Pennington*, 921 A.2d 135, 142 (D.C. 2007). We discussed two cases that fell into the flagrant dishonesty category, *In re Goffe*, 641 A.2d 458 (D.C.1994) and *In re Corizzi*, 803 A.2d 438 (D.C.2002).

**35.** *In re Gil, supra* note 19, 656 A.2d at 303, 304.

**36.** *In re Slattery, supra* note 17, 767 A.2d at 216.

**37.** In *Slattery*, the Board recommended a three-year suspension with a requirement of fitness for reinstatement, and Bar Counsel advocated disbarment.

accept the Board's recommendation because of Mr. Pelkey's (1) persistent, protracted, and extremely serious and flagrant acts of dishonesty (witnessed by the arbitrator, the hearing committee, and the California State Court of Appeal, and detailed herein); (2) his criminal conduct which amounts to theft as he sought to deprive Ms. Cavalli (with whom he also had a personal/romantic relationship that he denied) of any of the benefits of her labor and investments in the Pelkey/Cavalli business ventures by taking and controlling the monetary fruits of the ventures for his own personal use; as well as (3) his unconscionable actions in the courts, especially the California courts. Although Mr. Pelkey's dishonesty differs in some respects, we believe that it is akin to the seriousness of the dishonesty which prompted us to disbar the respondents in *Gil* (who took and used over $60,000 of a friend's money), *Slattery* (who, despite his position of trust, took over $10,000 from the bank account of a fraternal organization), and *Goffe* (whose behavior manifested repeated dishonesty and fabrication of evidence over an extended period of time). While Mr. Pelkey's behavior is not as egregious as that of the respondent in *Corizzi*, it does "reflect[ ] a continuing and pervasive indifference to the obligations of honesty in the judicial system," [38] as well as in the disciplinary system, and in his business relationships with Ms. Cavalli which placed him in a position of trust.

Mr. Pelkey has not been subjected to prior discipline, but we agree with the Board that "this factor [does not] materially impact[ ] the sanction appropriate for the course of misconduct engaged in by [him] over several years." Mr. Pelkey's behavior forced Ms. Cavalli to take legal and administrative action and to defend herself against his unwarranted, dishonest, and unscrupulous administrative and judicial actions. The arbitrator's award to Ms. Cavalli of around $300,000, the California courts' award of attorney's fees to her, and the California Court of Appeal's monetary sanction against Mr. Pelkey (payable to her) all underscore the seriousness of his misconduct. Furthermore, Mr. Pelkey's lack of remorse has been evident throughout the disciplinary proceeding and, despite the overwhelming evidence against him, he continues to resist acknowledging his wrongful and unethical conduct.

Accordingly, for the foregoing reasons, it is ORDERED that respondent Bruce A. Pelkey is disbarred from the practice of law in the District of Columbia, effective thirty days from the date of this opinion; and it is FURTHER ORDERED that his reinstatement is conditioned upon making full restitution to the Clients' Security Fund with interest at the legal rate of 6% and satisfying all outstanding judgments against him in favor of Linda Cavalli or the related business entities.

*So ordered.*

---

**38.** *In re Corizzi, supra* note 34, 803 A.2d at 443.