*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 13-BG-850

IN RE ROBERT S. FASTOV, RESPONDENT.

A Suspended Member of the Bar
of the District of Columbia Court of Appeals
(Bar Registration 56333)

On Report and Recommendation of the
Board on Professional Responsibility
(BDN-105-07)

(Submitted May 13, 2014[1])                    Decided September 18, 2014)

*Robert S. Fastov*, pro se.

*Julia L. Porter*, Assistant Bar Counsel, with whom *Wallace E. Shipp, Jr.*, Bar Counsel, and *Jennifer P. Lyman*, Senior Assistant Bar Counsel, were on the brief, for the Office of Bar Counsel.

Before THOMPSON and MCLEESE, *Associate Judges*, and KING, *Senior Judge*.

THOMPSON, *Associate Judge*:  In a Report issued on July 31, 2013, the Board

of Professional Responsibility (the "Board") concluded that Respondent Robert

---

[1] Oral argument was scheduled to take place in this case on April 17, 2014, but did not occur because of an emergency.  The court later determined that oral argument would not assist in resolution of the case and that the case would be submitted on the written record as of May 13, 2014.

Fastov violated Rules 3.1, 3.4 (c), 4.4 (a), and 8.4 (d) of the D.C. Rules of Professional Conduct in filing and prosecuting a lawsuit against Christie's International PLC *et al.* (the "*Christie's* matter"), and also violated Rules 3.1, 4.4 (a), and 8.4 (d) in filing and prosecuting an unrelated lawsuit against the Palisades Swimming Pool Association and certain members of its governing board ("the *Palisades* matter"). The Board's conclusions were based on the factual findings set out in a January 5, 2012, report of an Ad Hoc Hearing Committee (the "Hearing Committee" or the "Committee") and were largely in accord with the Committee's legal conclusions. The Board adopted the Hearing Committee's recommendation that Respondent be suspended from the practice of law for eighteen months and that he be required to demonstrate his fitness to practice as a condition of reinstatement. Respondent broadly attacks the Board's Report; Bar Counsel has filed only limited exceptions to it. We find it unnecessary to address all of the various issues raised by the parties, but conclude that the record and the law amply support a conclusion that, through his conduct in one or both of the matters, Respondent violated all of the foregoing Rules. We also adopt the recommended sanction.

## I.   Background

*A.* The *Christie's* Matter

The Hearing Committee found, and the Board accepted as "supported by substantial record evidence," the following. Respondent was admitted to the District of Columbia Bar in December 1969. In 1985, he retired from his position as Deputy Chief Counsel for an agency within the Department of Commerce. Thereafter, he opened an art gallery and worked as an art dealer. At some point, Respondent acquired a landscape painting that he believed was the work of 19th century Austrian artist Emil Jakob Schindler ("the painting" or "the Schindler painting").[2] In February 1993, he contacted Christie's London office in response to an advertisement he had received from the firm about an auction of German and Austrian art it planned for May of that year. In his letter to Christie's, Respondent proposed to consign the painting to Christie's for the auction. He testified before the Hearing Committee that, through telephone conversations, he and Wendy Goldsmith of Christie's reached an oral consignment agreement under which Christie's was required to offer the painting for sale as an "unqualifiedly authentic Schindler painting" and was specifically prohibited from seeking an expert opinion

---

[2] Respondent asserts that he acquired the painting as part of his private collection, and not in his capacity as an art dealer.

as to the painting's authenticity.[3]  In March 1993, Respondent sent the Schindler painting and two other paintings to Christie's and received in response a document that acknowledged receipt of the paintings and set forth Christie's conditions of sale, which reserved to Christie's "absolute discretion as to . . . whether the Lot is suitable for sale by Christie's, and . . . whether the views of any expert shall be obtained[,]" and provided that "Christie's reserves the right to withdraw any property at any time before the actual sale if, in Christie's sole judgment . . . there is doubt as to its attribution or to its authenticity[.]"  Before returning the document to Christie's, Respondent crossed out certain provisions, but, the Hearing Committee found, "did nothing to indicate" that the terms quoted above did not apply to the Schindler painting.

After Christie's received the painting in March 1993, a Christie's employee consulted Dr. Gerbert Frödl, director of a prominent Austrian art museum, about

---

[3]  In a declaration submitted in the *Christie's* litigation in April 2000, Goldsmith averred that she did "not have authority from [Christie's] to waive [Christie's] right to consult outside experts regarding works of art offered for consignment[,]" "never agreed with anyone, including Mr. Fastov, to waive [Christie's] rights in this respect[,]" and "did not consider [her]self to be entering into a binding agreement to auction the Painting at that time[.]"  Similarly, Mark Politmore, a Christie's executive who reviewed the painting, submitted a declaration in which he stated that "he [did] not know of any occasion when [Christie's] ha[d] waived terms relating to use of experts or discretion in case of authenticity questions."

the painting. According to statements by Christie's staff, Dr. Frödl advised that he could not render a definitive judgment as to the authenticity of the painting without seeing the original. Goldsmith attested that she called Respondent and told him that Christie's would not auction the painting because Dr. Frödl could not commit to an opinion without seeing the original painting. In contrast, Respondent testified that his understanding of what Goldsmith told him on or about April 1, 1993, was that Dr. Frödl had said that the painting was a "fake." In March 1994 correspondence to Respondent, Dr. Frödl told Respondent that he had never challenged the authenticity of the painting or called it a "fake." At that point, Respondent concluded that Christie's employees had been lying to him. That conclusion was the backdrop for a 79-page letter that Respondent sent to a Christie's executive in July 1994.

In the July 1994 letter, Respondent demanded that unless Christie's paid him $168,000 for the painting, he would sue for damages in excess of $1 million. He stated that he was "fully prepared to make a career of [the] lawsuit [he threatened], and an extremely lucrative and psychologically gratifying one at that" and said that once he was "in litigation mode," he would have "every incentive . . . to maximize . . . the pain to Christie's in court[.]" Although Respondent stated in the letter that his intent was "pacific[,]" he also expressed the intent to secure "Christie's

unconditional surrender" and asserted that there was no way that Christie's could "'spend' [him] out of this case."

On March 21, 1997, Respondent filed a 225-page Verified Complaint against Christie's in the United States District Court for the District of Columbia, alleging "Continuing Fraudulent Misrepresentation and Concealment of Material Facts"; "Continuing Negligent Misrepresentation and Concealment of Material Facts"; "Unfair Trade Practices"; "Breach of the Oral Consignment Agreement and Implied Duty of Good Faith and Fair Dealing"; "Negligence and Reckless Conduct"; and "Intentional Infliction of Emotional Distress" ("IIED"), and seeking compensatory and punitive damages totaling more than $7 million.

On May 1, 2000, Christie's moved for summary judgment, arguing that Respondent's claims were barred by the statute of limitations and that he had failed to establish any damages. In response, Respondent filed a 59-page opposition, to which he attached a 90-page declaration, a 461-page statement of disputed and undisputed facts, and three volumes, totaling more than 1500 pages, of exhibits. District Court Judge Paul Friedman rebuked Respondent for submitting a filing that did "the opposite" of "assisting the Court in rendering its decision" and that constituted "an abuse of the litigation process." The court cited Respondent's

"well-documented proclivity in this case to engage in obstructionist litigation tactics at the expense of the Court[ and] opposing counsel[.]"  Judge Friedman ordered Respondent to re-file his opposition, subject to page limitations, and ordered that in the future, Respondent would be personally fined and sanctioned each time he abused the litigation process.

Thereafter, Respondent filed a 45-page memorandum in support of a motion seeking leave to file a 25-page surreply.  The memorandum was accompanied by more than 40 additional pages of declarations, statements, transcripts, and other materials, some of which contained additional argument.  In an August 29, 2000, order, Judge Friedman struck Respondent's motion from the record, calling the filing "an abuse of the litigation process and a waste of the Court's time."  In a subsequent order granting Respondent's amended motion for leave to file a surreply, Judge Friedman cited Respondent's "tendency to skirt court orders by submitting unreasonably voluminous filings[.]"  Judge Friedman specified, *inter alia*, that Respondent's memorandum was not to exceed twenty-five pages in length and was to have its entire text other than footnotes "double-spaced and . . . in twelve-point Times New Roman or Courier font."  The 25-page surreply that Respondent filed thereafter, on January 19, 2001, "incorporate[d] by reference" two other voluminous documents that he had previously filed with the court and

had margins that appeared to be set at or near the smallest width possible in most word-processing programs. In addition, the vast majority of the text, including the bulk of Respondent's substantive argument, was contained in fifty-seven footnotes that were appended to the fewer than 210 lines of main text. Respondent attached to the filing a declaration that exceeded the page limit set by the District Court and that was accompanied by twenty-five exhibits, many of which contained additional legal argument and one of which was itself comprised of eighteen other exhibits. The Hearing Committee found that Respondent's "purported attempt to comply with the literal letter of Judge Friedman's order demonstrate[d] [his] apparent contempt for the rules of court."

In 2005, the *Christie's* matter was re-assigned to Judge William H. Stafford. In February 2006, Judge Stafford granted Christie's summary judgment motion, finding that Respondent's breach-of-contract and tort claims were time-barred by the applicable three-year limitations periods, and that, even if the claims were not time-barred, they would fail on the merits because (1) Respondent had failed to submit any evidence of conduct that "would shock the conscience or exceed all possible bounds of decency[,]" which was necessary to support an IIED claim; (2) the D.C. Consumer Protection Procedures Act, D.C. Code §§ 28-3901-3908 (2012 Repl.) ("the Act" or the "DCCPPA"), was inapplicable to Christie's because there

was nothing to support Respondent's argument that the Act operated extraterritorially; and (3) Respondent had failed to show that he suffered damages as a result of any conduct by Christie's.[4] Judge Stafford observed that Respondent's "claims to damages defy all credulity" and "ma[d]e sense only when viewed in the context of his open threats to achieve 'Christie's unconditional surrender.'" Citing the threats contained in Respondent's 79-page letter to Christie's, Judge Stafford found that Respondent's "unsupported, unmeritorious claims . . . were . . . initiated in bad faith with the intent to subject Christie's to 'the worst and most costly' litigation in Christie's experience."

Christie's filed a motion for attorneys' fees on April 6, 2006, arguing that Respondent had initiated the litigation in bad faith and had engaged in vexatious tactics. In his numerous and voluminous filings in response to Christie's motion, Respondent employed the same practices with respect to footnotes, declarations, and exhibits that Judge Friedman had criticized.[5] For example, he filed a motion

---

[4] Judge Stafford also observed that the record was "replete with evidence that Goldsmith did not and could not enter into an agreement utterly at odds with Christie's written Conditions of Business," which Respondent "acknowledged and accepted . . . when he signed and returned the written Receipt" to Christie's.

[5] The Board noted that one of Respondent's filings was "so voluminous that it could not be handled by the District Court's electronic filing system."

seeking leave to file a 24-page surreply to Christie's nine-page reply to his opposition to the attorneys' fees motion. Judge Stafford granted Christie's motion for attorneys' fees in an order dated March 14, 2007, finding that:

> [T]he record amply demonstrates that [Respondent] first initiated, then prosecuted this lawsuit in bad faith for the purpose of harassing Defendants. His egregious behavior, which unreasonably and vexatiously multiplied these proceedings, clearly warrants the imposition of sanctions under [28 U.S.C.] section 1927 as well as under the Court's inherent authority.

Judge Stafford cited Respondent's July 1994 letter to Christie's as evidence of his improper motive and intent in filing the lawsuit, and cited Respondent's unreasonably voluminous pleadings and his refusal to abide by the court's length restrictions, even after being exposed to personal sanctions, as examples of his abuse of the litigation process.[6]

---

[6] Throughout subsequent proceedings relating to the order awarding attorneys' fees, Respondent continued his practice of submitting numerous and lengthy pleadings. For example, in response to the 13-page declaration that Christie's submitted in support its claim for fees and costs, Respondent filed a 45-page memorandum and a 48-page declaration that included eight attachments, one of which was a 56-page document that discussed in detail the cases cited in the 45-page memorandum. In January 2008, Magistrate Judge Alan Kay issued a report and recommendation finding that Christie's request for $630,043.32 in fees and expenses was reasonable and warranted under 28 U.S.C. § 1927, but recommending that, in light of Respondent's finances, the court impose a sanction of only $110,000. Christie's indicated its willingness to accept the reduced amount "only if [Respondent] likewise accepts Judge Kay's Report and Recommendation

(continued…)

*B.* The Palisades Litigation

During June and July of 2004, the volunteer members of the governing board of Palisades, a private non-profit corporation that operates a recreational pool and tennis facility of which Respondent was a member, received complaints about Respondent's behavior at the facility, which is located in Montgomery County, Maryland. The numerous complaints alleged that Respondent interfered with children's dive team practices and competitions, pushed young children aside in the pool and used profanity around them, and made inappropriate and sexually suggestive comments to pool patrons and staff members, some of whom were teenagers. Upon receiving these complaints, Palisades President Jeffrey Bryan, who was responsible for handling membership issues and dealing with complaints from or about members and staff, consulted with other members of the governing

---

(…continued)
and does not seek to have it reduced." Respondent did not accept Judge Kay's recommendation and instead followed it with another spate of lengthy filings (e.g., a 45-page reply to Christie's four-page response to Magistrate Judge Kay's recommendation, accompanied by a 14-page declaration that consisted mostly of additional argument). Judge Stafford awarded Christie's the full amount of $630,043.32 as a sanction for what he described as Respondent's "bad faith, vexatious, and oppressive conduct in this case[,]" which he found Respondent had continued to engage in even in submitting his objections to Magistrate Judge Kay's report.

board and those who had witnessed or complained about Respondent's conduct before deciding to approach Respondent privately to address concerns about Respondent's behavior. On July 6, 2004, Bryan telephoned Respondent to discuss his conduct, and directed him to refrain from further confrontational behavior towards staff and members. One of the teenagers who had complained about Respondent's behavior attested that on July 7, 2004, Respondent cornered her above the edge of the pool and angrily berated her about her complaint until the girl's parent's intervened. Several witnesses to the exchange corroborated the teenager's account. Upon hearing of this confrontation, and after again consulting with members of the Palisades Board, Bryan wrote to Respondent on July 13, 2004, admonishing that his offensive and abusive conduct would not be tolerated and instructing:

> You will refrain from any abusive language (threatening or profane), physical intimidation or the creation of any hostile airs toward any members of the Palisades membership, including any of our kids, regardless of age. . . . You are not to touch in any manner, for any reason, any one other than one of your own family.

> You will cease and desist in any behavior that is perceived to be leering, sexually intimidating, or creating a sexually hostile environment which serves to intimidate and frighten our female members and staff. You are not to touch in any manner, for any reason, anyone other than a member of your own family.

The Hearing Committee found that the letter was "discussed only among the Board members, and was sent to Respondent only[,]" and noted that Respondent admitted during his hearing testimony that he had "no evidence that the letter was circulated to anyone other than Palisades Board members" and, eventually, their counsel in the litigation that ensued.

Respondent replied to this letter with a series of threatening communications in which he demanded the names and contact information of any complainants and witnesses and copies of any and all documents regarding complaints received about his conduct. Respondent also demanded formal rescission of the July 13, 2004, letter, an apology from Bryan, and a payment of $250 (his "discounted hourly rate[,]" he explained) for the time that he had spent writing letters to the Board. Respondent threatened that, if his demands were not met, he would initiate lengthy and ruinously expensive litigation, writing that he was a "retired, but very experienced, tenacious, vigorous and successful litigator," promising that he would devote twenty-four hours a day to pursuing the matter, and stating that that he would seek to humiliate and embarrass Board members, who would have to spend hundreds of hours and tens of thousands of dollars defending themselves against his claims. Respondent further threatened that he would file a separate "class action suit on behalf of [him]self and all other members of Palisades seeking to

enjoin Palisades from paying for or otherwise indemnifying or subsidizing [Bryan's] defense[.]"

In September 2004, Bryan sent Respondent a letter informing him that the Board had decided not to pursue the matter any further. However, Respondent's threats of litigation continued unabated. In one letter, Respondent threatened that, in the course of the litigation he intended to initiate if his demands were not met, he planned to take "50 to 60 depositions" including those of "you and each and every Board Member and Employee of Palisades in 2004[,] [including] . . . the pool manager and all of the many 2004 lifeguards, swim team instructors and dive team instructors, and the kids who worked in the front office." He threatened to "break" the pool financially.

Respondent filed a complaint in the United States District Court for the District of Maryland on June 29, 2005, asserting that the court had federal diversity jurisdiction pursuant to 28 U.S.C. § 1332 (a)(1) (2006). Although Respondent, himself a D.C. resident, named most of the Palisades Board Members as individual defendants, he (with one inadvertent exception) omitted the names of Board Members who resided in the District, acknowledging subsequently that he did so

intentionally[7] and claiming that he did so under the belief that they were "permissible defendants" and not "indispensible parties." Respondent listed eleven causes of action in his complaint, including "Breach of Contract And Implied Obligation To Deal In Good Faith And Fairly With Plaintiff"; "Breach Of Trustee's[] Obligation As A Fiduciary And Of A Confidential Relationship"; "Negligence, Gross Negligence, Recklessness, Malicious And/Or Willful Misconduct"; "Fraud, Deceit And Intentional Stonewall, Concealment And Cover-Up Of Material Facts"; "Negligent Misrepresentation And Negligent Stonewall, Cover-Up And Concealment of Material Facts"; "Violations Of The Maryland Consumer Protection Act"; "Defamation By Libel And/Or Slander By Defendants Bryan, Neudorfer, Other Palisades Officials And The John And Jane Doe Defendants"; "Intentional Infliction Of Emotional Distress"; "Civil Conspiracy (Joint Tortfeasor Liability)"; "Disgorgement And Repayment By Palisades Officials Of Palisades Compensation Paid The Children Of Palisades Officials"; and "Liability For Damages Of Defendants[,]" and sought compensatory damages in the amount of $500,000 and punitive damages in the amount of $1 million.

---

[7] The Hearing Committee found that Respondent "admitted that he manufactured diversity[.]"

After the Palisades defendants filed a Motion to Dismiss or for Summary Judgment, the court entered an order on January 31, 2006, in which it dismissed Respondent's claims for lack of subject matter jurisdiction (no diversity of citizenship), found that the D.C.-resident members of the Board were indispensable parties, and observed that Respondent's claim that he believed diversity jurisdiction did exist "defie[d] credulity." The court also granted the defendants' motion for sanctions, finding that Respondent's "conduct in this suit and his actions leading to this litigation violate the very text of [Fed. R. Civ. P.] 11." "Taken as a whole," the court concluded, Respondent's "Complaint and subsequent pleadings contain ample evidence that [Respondent] did not file this suit [to] vindicate his rights, but to harass and retaliate against Defendants."[8]

---

[8] In his filings during subsequent attorney's fee proceedings, an appeal to the Fourth Circuit, and a petition for rehearing and rehearing en banc, Respondent cast aspersions on his opposing counsel and on the court, writing, *inter alia*, that defendants' counsel was "slimy" and that the court was "bias[ed]" and that its orders were "diatribe[s], impugning [Respondent's] integrity and judgment" and "riddled with abuses of discretion[.]" He also continued his practice of submitting lengthy filings (for example, responding to the Palisades defendants' seven-page motion for attorney's fees with a 50-page opposition, a 79-page declaration that contained additional argument, and a mostly single-spaced 56-page supplement comprised entirely of legal argument. The Hearing Committee found that the Palisades Board eventually agreed to withdraw its request for attorney's fees just to get away from Respondent's "constant barrage of bullying[.]"

*C.* Proceedings before the Board of Professional Responsibility

On October 8, 2010, the Office of Bar Counsel issued a Specification of Charges alleging that Respondent had violated five provisions of the D.C. Rules of Professional Conduct in the course of litigating against Christie's and Palisades. Bar Counsel charged that, with respect to the *Christie's* litigation and *Palisades* litigation, Respondent violated Rule 3.1 by pursuing frivolous claims and asserting issues for which there was no basis; violated Rule 3.2 in *Christie's* by seeking to delay the proceedings when he knew or when it was obvious that such delays would serve solely to harass or maliciously injure another; violated Rule 3.4 (c) in *Christie's* by knowingly disobeying an obligation under the rules of a tribunal; violated Rule 4.4 in both *Christie's* and *Palisades* by using litigation tactics that had no substantial purpose other than to embarrass, delay, or burden a third person; and violated Rule 8.4 (d) in both *Christie's* and *Palisades* by engaging in conduct that seriously interfered with the administration of justice.

Bar Counsel argued that the Hearing Committee should give preclusive effect to Judge Stafford's March 14, 2007, order in *Christie's*, in which Judge Stafford found, as his basis for sanctioning Respondent pursuant to 28 U.S.C. § 1927 (2006), that the record "amply demonstrates that Plaintiff first

initiated, then prosecuted this lawsuit in bad faith for the purpose of harassing Defendants" and that "[h]is egregious behavior . . . unreasonably and vexatiously multiplied these proceedings[.]" The Hearing Committee, however, declined to apply preclusive effect to Judge Stafford's findings, stating that it wished "to give Respondent an opportunity in this forum to present evidence and argument on the issue" and "wanted to . . . make up [its] own mind[] as to Respondent's conduct[.]"

Following a three-day hearing on March 15-17, 2011, the Hearing Committee issued a 90-page Report and Recommendation on January 5, 2012, in which it painstakingly reviewed the evidence and found that Bar Counsel had proven all of its charges by clear and convincing evidence[9] (although it did not agree that Respondent had violated each of these rules in precisely the manner that Bar Counsel had charged). The Hearing Committee recommended that Respondent be suspended from the practice of law for eighteen months and be required to demonstrate his fitness to practice law before being reinstated.

---

[9] The Hearing Committee found, *inter alia*, that Respondent "may reasonably have believed that he had a claim against Christie's," but that he "used the legal system not as a means of resolving legitimate disputes, but to punish those with whom he had a disagreement[,]" and that he "used means intended to increase the cost and burden of litigation" and "used the courts to mete out . . . guaranteed retribution" against the people with whom he was angry. The Committee further found that Respondent "pressed objectively meritless issues, ignored court rules and orders, . . . and filed hundreds of pages of frivolous pleadings."

In a Report and Recommendation issued on July 31, 2013, the Board adopted the Hearing Committee's findings of fact and most of its conclusions of law. The Board found that the Committee had erred in declining to give preclusive effect to the District Court's findings that supported the court's imposition of sanctions in the *Christie's* matter. The Board also concluded, however, that regardless of the applicability of issue preclusion, Bar Counsel had established the almost all of the charged Rule violations by clear and convincing evidence.

With respect to the *Christie's* matter, the Board found that the criteria for applying collateral estoppel were "fully satisfied" with respect to violations of Rules 3.1 (a), 3.4 (c), 4.4 (a), and 8.4 (d). However, it went on to address whether Bar Counsel had proven those and the other charged Rule violations by clear and convincing evidence "in the event [this court] disagrees" with the application of collateral estoppel. The Board concluded that Respondent violated Rule 3.1 by pursuing his contract and related tort claims against Christie's "because he should have known that his claims were time-barred"; by bringing his IIED claim, because Christie's alleged conduct "did not come close" to being extreme or outrageous and thus Respondent "could not have had a faint hope of succeeding on the merits"; by bringing his DCCPPA claims, "because he was not selling the painting

as a consumer"; and by bringing his other claims when "he had no credible claim that he had suffered any legally cognizable injury as a result of Christie's acts forming the basis of these claims."

The Board concluded that Respondent violated Rule 3.4 (c) with respect to his January 19, 2001, surreply by misusing exhibits and attachments to evade applicable page limits and by filing his 225-page initial complaint. The Board further found that Respondent violated Rules 4.4 (a) and 8.4 (d) by "employing litigation tactics that had no substantial purpose other than to harass, delay or burden Christie's and that wasted the time and energy of the courts." The Board concluded, however, that Bar Counsel failed to establish that Respondent violated Rule 3.2 because the evidence did not clearly show that Respondent's litigation tactics "were . . . employed for the purpose of delay."

With respect to the *Palisades* matter, the Board found that Bar Counsel proved by clear and convincing evidence that (1) Respondent violated Rule 3.1 by filing his tort and contract claims, all of which had no basis in fact or law; (2) that Respondent violated Rule 4.4 in that he filed a (240-page) complaint that was without any factual basis and was designed to "manufacture jurisdiction" and thereafter filed voluminous pleadings for the sole purpose of harassing or

embarrassing the *Palisades* defendants; and (3) that he violated Rule 8.4 (d) by using the judicial system to harass the Palisades Board.

The Board adopted the Hearing Committee's sanction recommendation. It found that Respondent's inexcusable conduct in "us[ing] the legal system to vent his personal pique at Christie's and Palisades rather than trying to vindicate a right protected by law" warranted a severe sanction, especially in light of the Hearing Committee's finding that Respondent had shown no remorse for his conduct.

## II. The Instant Appeal

In his brief to this Court, Respondent broadly challenges the Board's Report, contending that the Board, like the Hearing Committee, Bar Counsel, and the federal courts, "almost totally ignored" his factual explanations and legal arguments. Respondent also takes issue, at great length, with the Board's application of collateral estoppel to find violations of Rules 3.1, 3.4 (c), 4.4 (a), and 8.4 (d) in the *Christie's* matter. In addition, Respondent asserts that the recommended sanction is unsupported by law.

Bar Counsel defends the Board's application of collateral estoppel, but asserts that Respondent's challenge to the Board's application of that doctrine is ultimately "of no consequence" since the Board independently found "all the same ethical violations based on clear and convincing record evidence." Bar Counsel argues that the Board's findings and conclusions were correct, with one exception: The Board erred, Bar Counsel contends, in failing to adopt the Hearing Committee's finding that Respondent's litigation tactics in *Christie's* violated Rule 3.2 (a). Bar Counsel supports the Board's recommended sanction (but urges that an enhanced sanction would be justified on the basis that Respondent gave false testimony before the Hearing Committee about the details of his oral agreement with Goldsmith and about his initial telephone call with Bryan[10]).

Our standard of review is well-established. This court, "like the Board itself, must accept the factual findings of the Hearing Committee, unless they are not supported by substantial evidence in the record[,]"[11] *In re Robinson*, 74 A.3d 688,

---

[10] As the Hearing Committee and Board made no findings about the difficult issue of whether Respondent gave false (rather than mistaken) hearing testimony, neither do we, since it will have no impact on our decision as to sanctions and since, as Bar Counsel acknowledges, "the imposition of a fitness requirement will serve to protect the public and the courts."

[11] In original discipline cases such as this one, "the hearing committee conducts the hearings and makes factual findings and recommendations which it

(continued…)

694 (D.C. 2013), but we review questions of law *de novo*. *In re Martin*, 67 A.3d 1032, 1039 (D.C. 2013). We "shall adopt the recommended disposition of the Board unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted." D.C. Bar Rule XI, § 9 (h)(1).

### III.     Analysis

### *A.*     Collateral Estoppel

We begin by briefly addressing Respondent's argument that the Board erred by giving preclusive effect to the District's Court's findings in *Christie's*, and using those findings as a factual predicate to establish Respondent's violations of Rules 3.1, 3.4 (c), 4.4 (a), and 8.4 (d) in the *Christie's* matter (and Bar Counsel's

---

(…continued)
submits to the Board for review[.]" *In re Temple*, 629 A.2d 1203, 1208 (D.C. 1993). "[T]he Board has the power to make its own factual findings and forward them to the court with a recommendation[,]" but "must accept the hearing committee's factual findings if they are supported by substantial evidence on the record as a whole." *Id*. However, the Board "owes no deference to the hearing committee's determination of 'ultimate facts,' which are really conclusions of law." *In re Micheel*, 610 A.2d 231, 234 (D.C. 1992). Bar Counsel must establish a Rule violation by clear and convincing evidence. *See, e.g.*, *In re Anderson*, 778 A.2d 330, 335 (D.C. 2001).

argument that the Hearing Committee's failure to do so was erroneous). For collateral estoppel to apply, it must be the case that "(1) the issue [was] actually litigated and (2) determined by a valid, final judgment on the merits; (3) after a full and fair opportunity for litigation by the parties or their privies; (4) under circumstances where the determination was essential to the judgment, and not merely dictum." *In re Wilde*, 68 A.3d 749, 759 (D.C. 2013) (internal quotation marks omitted). Further, to guard against the risk of unfairness, there must be a consideration of "the fairness of applying collateral estoppel to the facts of the case[,]" *id.* (internal quotation marks omitted), including a consideration of whether "compelling circumstances make it appropriate that the party be permitted to relitigate the issue." *Id.* at 761 (internal quotation marks omitted).

Respondent contends that Judge Stafford's summary judgment ruling was contrary to black letter law[12] and argues that both the summary judgment ruling that Respondent's claims against Christie's were "unsupported[ and] unmeritorious," and the "vengeance-driven" sanctions order that followed that ruling, reflect Judge Stafford's "*animus*" against Respondent. Respondent asserts

---

[12] Respondent asserts, for example, that summary judgment was unwarranted because there was a factual dispute as to whether he and Christie's had reached an oral consignment agreement whose terms were as Respondent claimed.

that the animus was based on correspondence that Christie's sent to the court, advising it of the sanctions that had been entered against Respondent by the *Palisades* court, and also on Respondent's (post-summary judgment) request that Judge Friedman re-assume jurisdiction of the case.[13] Respondent further argues that collateral estoppel could not fairly be applied in this case because Judge Stafford refused him the opportunity for an evidentiary hearing at which the court could assess the credibility of his claimed understanding of his dealings with Christie's.[14]

---

[13] Thus, Respondent suggests, the District Court did not consider with impartiality his claim that he was "lulled" into not suing Christie's earlier, and ignored case law (*Williams v. Central Money Co.*, 974 F. Supp. 22, 27 (D.D.C. 1997)) recognizing the extraterritorial reach of the DCCPPA.

[14] *Cf. Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 330-31 (1979) ("[A]nother situation where it might be unfair to apply offensive estoppel is where the second action affords the defendant procedural opportunities unavailable in the first action that could readily cause a different result."). We note that, after hearing Respondent's testimony, the Hearing Committee found that Respondent "believes that he had an oral consignment agreement with Christie's" (but also found that Respondent and Christie's "did *not* enter into such an agreement" and in particular did not agree that Christie's would not seek an opinion on the authenticity of the painting). The Board similarly stated that Respondent "believed . . . that Christie's would take the consignment of the Schindler without seeking an outside opinion as to its authenticity." The Hearing Committee also found (contrary to Judge Stafford's finding that Respondent's "claims to damages def[ied] all credulity") that Respondent may have incurred, as he claimed, about $3600 in costs to "rehabilitate" his painting (but that the value of the painting did not suffer because "whatever purportedly negative, but disavowed, statements had been made were made only to Respondent").

We agree with Bar Counsel that "[n]othing in the underlying court records . . . suggests that the court[] adjudicated Respondent's claims on any basis other than the evidence presented[.]"[15] However, we decline to resolve Respondent's unfairness claims point-by-point because (1) we agree with Bar Counsel that the issue of collateral estoppel is ultimately of no consequence in this case since the Board found independently that the record evidence showed clearly and convincingly that Respondent violated each of the Rules cited in the Specification of Charges; (2) Judge Stafford's findings did not correspond to all of the charged Rule violations and thus, as the Board found, did not estop Respondent from contesting certain of the charges; and (3) the (mostly documentary) evidence that we must examine and that the Board had to examine to determine whether collateral estoppel applied is co-extensive with the evidence that is relevant to an original determination of whether Respondent violated the Rules through his

---

[15] We also have no doubt that, to the extent that the court may have overlooked whatever merit there was in Respondent's explanations and arguments, it was, somewhat ironically, the unreasonable voluminousness of Respondent's filings and their difficult-to-read format that were to blame for that circumstance. In any event, the court, like the Hearing Committee and the Board, was not required to adopt Respondent's version of events, and the court's findings could be conclusive for collateral estoppel purposes even if they were somehow erroneous. *See K.H. v. R.H.*, 935 A.2d 328, 335 (D.C. 2007) ("The mere fact that a judgment is erroneous does not deprive it of . . . conclusiveness[.]").

conduct in the *Christie's* matter. We therefore confine our review to the Board's and Hearing Committee's findings and analysis with respect to the record evidence and do not decide the matter of issue preclusion.[16] *Cf. In re Reback*, 487 A.2d 235, 239 (D.C. 1985) ("We need not decide whether this argument is correct, because the Board majority's alternative ground for finding a violation . . . is adequate to support the Board's ruling."), *vacated on other grounds*, 492 A.2d 267 (D.C. 1985); *In re Lee*, 755 A.2d 1034, 1036 n.4 (D.C. 2000) ("[W]e need not decide [the issue] conclusively since it is not determinative of the result.").

### *B.* Respondent's Rule Violations

Following that course, and for the following reasons, we agree with the Board that the record evidence established by clear and convincing evidence that Respondent violated Rules 3.1, 3.4 (c), 4.4 (a), and 8.4 (d). We decline to address, whether Respondent violated Rule 3.2 because resolution of that issue does not affect our ultimate decision as to whether the recommended sanction is warranted.

### 1. Rule 3.1

---

[16] This is notwithstanding our agreement with Bar Counsel that there are "sound policy reasons" for applying collateral estoppel where appropriate in order to "conserv[e] the resources of the disciplinary system[.]"

Rule 3.1 provides in relevant part that "[a] lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous, which includes a good faith argument for an extension, modification, or reversal of existing law." We need discuss only the *Palisades* matter to explain why we agree that Bar Counsel proved by clear and convincing evidence that Respondent violated this Rule. Respondent admitted during his testimony before the Hearing Committee that he put in his *Palisades* complaint "everything but the kitchen sink" and that the legal descriptions he attached to his claims were "very flexible" labels that he affixed to his account of the underlying facts in order to find "a button[.]" As the Hearing Committee found, Respondent "essentially conceded that this suit lacked any merit when he testified that many of the claims in his Complaint were 'levers' or 'pressure points' intended to cause the Palisades Board to settle with him."

The record supports the Board's and the Hearing Committee's finding that Respondent had no colorable claim because "no one from Palisades did anything even remotely actionable" that justified the filing of Respondent's complaint. As the Hearing Committee found, the Palisades Board was not required to permit Respondent to engage in abusive, bullying, or inappropriate conduct, and

Respondent presented no evidence that its actions, which the Hearing Committee found were a "legitimate exercise of [the Board's] duties and obligations to ensure the safety and well[-]being of its members[,]" caused him compensable harm. There is no record evidence that Palisades ever defamed Respondent by accusing him of having committed, in Respondent's words, "child molestation, pederasty, pedophilia, or any other inappropriate sexual conduct . . . [or] battery or assault[,]" or published to anyone any defamatory accusation, and the Board was justified in rejecting Respondent's claim, which he repeats in his brief filed in this court, that he reasonably interpreted Bryan's letter as leveling such accusations. Further, as the Board and the Committee found, there was no evidence of a confidential relationship between Respondent and Palisades that could support Respondent's breach of fiduciary duty claim;[17] no discernible basis for Respondent's negligence claim; no evidence of fraud or misrepresentation;[18] nothing to indicate that, with respect to Palisades, Respondent was a consumer of services from a merchant such

---

[17] *Cf. Latty v. St. Joseph's Soc'y of the Sacred Heart*, 17 A.3d 155, 162-63 (Md. Ct. Spec. App. 2011).

[18] Respondent claims that Bryan and the Palisades Board knowingly lied when they asked him to direct to Bryan any requests for further information about the complaints against him, as evidenced by Bryan's refusal to provide him with contact information for everyone who had complained about his misconduct. But the referral of questions to Bryan hardly created an obligation for Bryan to obey any and all demands for information that Respondent might make, however intrusive.

that he could have a claim arising under the Maryland Consumer Protection Act; no extreme conduct to support an IIED claim; no underlying tort to support Respondent's civil conspiracy claim; and no evidence of a Palisades rule or by-law that prohibited the hiring of family members as pool staff that could have supported Respondent's disgorgement claim.

The record supports the Hearing Committee's finding that Respondent sued because he wanted to make miserable the lives of Palisades Board members who had had the "temerity to tell him that his behavior was unacceptable," not because he had claims that he legitimately believed entitled him to relief under the law. In addition, there was no basis in fact or law for Respondent's claim that the court had diversity jurisdiction.

2. Rule 3.4 (c)

Rule 3.4 (c) provides that a lawyer shall not "[k]nowingly disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists[.]" Bar Counsel charged, and the Hearing Committee and Board also found, that Respondent violated Rule 3.4 (c) in the *Christie's* matter by attaching argumentative exhibits to his memoranda in order to

evade the page limits set by the federal rules and (in his January 19, 2001, surreply) by dramatically reducing the margins, presenting almost the entirety of his argument in single-spaced footnotes, and attaching a declaration that exceeded the length limit set by the court. Bar Counsel also charged that Respondent further violated Rule 3.2 (c) by filing his 225-page (443-paragraph) complaint. Although the Hearing Committee concluded that Bar Counsel had not proven that Respondent knew that such a lengthy pleading was improper, the Board sustained the charge, concluding that knowledge of the "short and plain statement" standard embodied in Fed. R. Civ. P. 8 could be imputed to Respondent, who asserts that he was a high-ranking litigator in the Department of Commerce and boasted of his litigation experience.

We agree with the Board that, with respect to the charges based on Respondent's evasion of court-imposed page limits through the use of argumentative exhibits and attachments, the misuse of footnotes,[19] and the manipulation of page margins, the evidence of his violation of Rule 3.2 (c) is overwhelming. We note that while Rule 3.4 provides that "open refusal" of court

---

[19] Respondent's argument that his lengthy footnotes were "not barred or limited by any court [r]ule" (emphasis omitted) misses the point that his lengthy footnotes were obviously designed to evade Judge Friedman's order imposing a page limit and requiring that the text be double-spaced.

orders does not constitute a violation of the Rule when "based on an assertion that no valid obligation exists[,]" and while Respondent complained bitterly throughout the antecedent litigation about the length requirements that the court attempted to impose on his filings, his complaints did not relieve Respondent of his Rule 3.4 violations because the violations were not "open refusals," but were undertaken through evasive measures. We also agree with the Board's conclusion that Respondent violated Rule 3.4 by knowingly failing to comply with the "short and plain" standard for initial pleadings.[20]

3. Rule 4.4 (a)

Rule 4.4 (a) provides in pertinent part that, "[i]n representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, . . . or burden a third person . . . ." We are satisfied that Bar Counsel proved a violation of this Rule by clear and convincing evidence. In *Palisades*, the evidence established that even after the Palisades Board notified Respondent that it did not intend to pursue the complaints that it had made against him and that it considered the matter closed, Respondent proceeded with litigation through which,

---

[20] Respondent's explanation that he prepared the "lengthy" complaint he filed as a "Quasi-Affidavit for Summary Judgment purposes" is entirely unavailing.

he openly threatened, he would destroy Bryan's personal finances, business, and reputation, would "break" the Palisades pool, and would harass Board members, their families and children, and other pool employees. He acknowledged that he included the disgorgement count in his complaint (relating to his allegations that it was somehow improper for Board members' children to also work as pool staff) to "cause Bryan's buzzer to go off" and to make him "collapse." As to the *Christie's* matter, the record as a whole provides substantial support for the Board's and the Hearing Committee's conclusion that Respondent engaged in discovery and motions practice that was "entirely out of proportion to any reasonable dispute between the parties and any colorable damage claim" and that was undertaken "solely to make Christie's give up, in order to avoid Respondent's continued onslaught of paper and the attendant expense"; and that Respondent litigated against Christie's in a manner that was "designed to cause Christie's to incur maximum costs" and that was "for no purpose other than to harass Christie's."[21] Although in each case Respondent was representing himself rather than another client, we agree with the observation of a sister jurisdiction that "[t]he intent and purpose of Rule 4.4 is served" by the "common sense" "construction that a lawyer is representing a client when he represents himself[.]" *Attorney Grievance*

---

[21] Thus, we reject Respondent's arguments about "egregiously erroneous, inferred speculations concerning [his] bad faith intent to run up Christie's costs of litigation."

*Comm'n of Maryland v. Alison*, 565 A.2d 660, 668 (Md. 1989) (citing *In re Segall*, 509 N.E.2d 988, 990 (Ill. 1987) (an attorney who is himself a party to the litigation represents himself within the meaning of the disciplinary rules)); *see also In re Pelkey*, 962 A.2d 268, 280 (D.C. 2008) (finding a violation of Rule 4.4 (a) based on conduct that Pelkey took while proceeding *pro se*).

4. Rule 8.4 (d)

Rule 8.4 (d) provides that it is professional misconduct for a lawyer to "[e]ngage in conduct that seriously interferes with the administration of justice[.]" The record makes plain that Respondent's meritless and voluminous filings wasted the time and resources of the courts (requiring them, as the Board found, to "wade through his verbose and repetitive pleadings") and, particularly because of their excessive single-spacing and excessive argument, unnecessarily burdened the courts. Respondent argues that his tactics did not "taint the judicial process in more than a *de minimis* way" because his filings were quickly and summarily disposed of by the court. But to find a violation of Rule 8.4 does not require a demonstration that the violator actually "cause[d] the court to malfunction or make an incorrect decision." *In re Hopkins*, 677 A.2d 55, 59 (D.C. 1996); *In re Uchendu*, 812 A.2d 933, 941 (D.C. 2002). Rather, it is sufficient that the

respondent's conduct burdened the judicial system. *In re Spikes*, 881 A.2d 1118, 1127 (D.C. 2005). Respondent's voluminous, meritless, and difficult-to-read filings did precisely that.

## *C.* Sanctions

The imposition of bar discipline sanctions "is not an exact science but may depend on the facts and circumstances of each particular proceeding." *In re Goffe*, 641 A.2d 458, 463 (D.C. 1994). Relevant considerations may include the nature and seriousness of the misconduct; the prejudice, if any, to the client that has resulted from the misconduct; whether the misconduct involved dishonesty or misrepresentations; the presence or absence of violations of other ethical rules; whether the lawyer has a history of prior discipline, and whether the lawyer has acknowledged his wrongful conduct. *Pelkey*, 962 A.2d at 281. "Generally speaking, if the Board's recommended sanction falls within the wide range of acceptable outcomes, it will be adopted and imposed." *In re Austin*, 858 A.2d 969, 975 (D.C. 2004).

Respondent disputes that any sanction should be imposed, noting that he has "no intention, capacity or need to practice law for compensation in the future" and

citing his "health problems." Bar Counsel initially sought a three-year suspension in addition to a fitness requirement, but does not oppose the Board's recommended sanction of an eighteen-month suspension and a fitness requirement. We conclude that the Board's recommended sanction is justified. As described above, through his conduct in the *Christie's* and *Palisades* litigation, Respondent violated several provisions of the Rules of Professional Conduct. Far from exhibiting remorse for his egregious and repeated misconduct, Respondent has refused to acknowledge that he has engaged in any wrongdoing. While Respondent has no prior disciplinary history, this factor does not weigh heavily in his favor in light of his representations that he has not been engaged in the practice of law for nearly three decades, with the exceptions of his involvement in *Christie's* and *Palisades*.

As we have observed many times, the sanction in a bar discipline case should fall within the range of sanctions imposed in other cases involving similar misconduct. In this respect, the sanction recommended by the Board is an appropriate, mid-range sanction. *See, e.g.*, *In re Spikes*, 881 A.2d 1118 (imposing thirty-day suspension for the filing of a meritless defamation claim in retaliation for the defendant's report of prior misconduct to Bar Counsel, conduct found to violate Rules 3.1 and 8.4 (d)); *In re Thyden*, 877 A.2d 129 (D.C. 2005) (imposing thirty-day suspension where the lawyer filed, and appealed the denial of, a motion

to dismiss a bankruptcy petition and an adversary proceeding, even though he acknowledged a lack of standing, and then filed a subsequent adversary proceeding making essentially the same claims, thereby burdening and delaying the underlying bankruptcy petition); *In re Shieh*, 738 A.2d 814 (D.C. 1999) (reciprocal discipline case in which this court declined to adopt the Board's recommendation of a two-year suspension, and instead disbarred the lawyer, where the record showed that he was found repeatedly to have filed and pursued "baseless, vexatious litigation" and to have filed lawsuits solely to harass his opponents, and also revealed a history of "frivolous motions (including for removal of cases to federal court and recusal of judges), meritless appeals, and disobedience of court orders"); *In re Orci*, 974 A.2d 891 (D.C. 2009) ( disbarring lawyer who had "filed multiple frivolous claims to harass and intimidate others[,]" "knowingly flouted court orders[,]" "engaged in abusive litigation tactics[,]" and "seriously interfered with the administration of justice[,]" but also had "engaged in fraudulent and dishonest conduct"); *In re Ditton*, 980 A.2d 1170 (D.C. 2009) (imposing five-year suspension with fitness requirement where the lawyer had exhibited "a long history of filing civil actions against numerous and various defendants on grounds that are, at best, of questionable merit"). The recommended fitness requirement is appropriate because the record raises serious questions about Respondent's judgment and his understanding of and regard for court rules and the Rules of Professional Conduct,

and "casts a serious doubt upon" his continuing fitness to be trusted with litigation matters. *See In re Cater*, 887 A.2d 1, 24 (D.C. 2005) (approving the "serious doubt" test) (internal quotation marks omitted); *see also In re Chisholm*, 679 A.2d 495, 505 (D.C. 1996) (citing attorney's "refusal to accept responsibility for his actions" and his "lack of contrition" as reasons for requiring him to demonstrate his fitness to practice as a precondition to reinstatement).

Respondent argues that the imposition of sanctions on him will accomplish nothing since he has "not practice[d] law for compensation since December 1985" and does not intend to resume practice, and since a suspension would not prevent him from filing *pro se* claims against his adversaries. These points may be correct, but an important purpose of discipline is "to maintain the integrity of the profession and to . . . deter other attorneys from engaging in similar misconduct." *In re Reback*, 513 A.2d 226, 231 (D.C. 1986). We therefore adopt the recommended sanction.

## IV.    Conclusion

For the foregoing reasons, Respondent is hereby suspended from the practice of law in the District of Columbia for a period of eighteen months, commencing on

the date when he filed an affidavit in compliance with D.C. Bar R. XI, § 14 (g). His reinstatement is conditioned upon a showing of fitness to resume the practice of law, in accordance with D.C. Bar R. XI, § 16.

*So ordered.*